IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DKC 22-258 |
| | * | |
| ALI DICKERSON, | * | |
| | * | |
| Defendant. | * | |
| ******* | | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On June 21, 2023, Ali Dickerson ("Defendant") appeared before this Court and pleaded guilty to Count One of the two-count Indictment pending against him, specifically, theft of mail matter in violation of 18 U.S.C. § 1708. For the reasons below, the United State recommends that the Court impose a guideline sentence of **33 months' imprisonment**, followed by a **three-year period of supervised release**. No victim of the Defendant's conduct has requested restitution, no forfeitable assets were seized, and Defendant does not have the financial ability to pay a fine. As such, the government is requesting no financial penalties as part of sentencing in this case aside from the mandatory special assessment.

Criminal Conduct

The U.S. Postal Service (USPS) has witnessed a significant increase in crimes focusing on the acquisition, and later use, of proprietary "Arrow Keys" that are issued to postal employees whose duties involve collecting mail deposited in receptacles. For the convenience of the USPS, one Arrow Key opens a varying number of collection boxes in a specified geographic area, making them a critical vulnerability that criminals have discovered and exploited with increasing frequency.

Typically, collection boxes in business districts or wealthier neighborhoods are targeted because business owners or more wealthy residents frequently place checks for larger amounts in locked collection boxes—which the Arrow Keys open—beleiving them more secure than placing them in an individual residential mailbox.Checking accounts of businesses and higher-income individuals also frequently hold a much higher average balance that may be exploited either by altering a check taken from a deposit receptacle, or by using the machine readable data at the bottom of a stolen check to counterfeit other checks that appear to be from those more lucrative accounts made payable to associates.

As detailed in Defendant's statement of facts, in the early morning of May 25, 2022, Defendant accompanied three co-defendants in order to steal mail from USPS receptacles in Bethesda, Maryland using an Arrow Key.  The vehicle, driven by co-defendant Eyalan Owona, was spotted by a Montgomery County Police Department (MCPD) officer traveling in Bethesda's business district and pulling up to mail deposit boxes.  The right rear passenger, Benjamin Washington, would exit the back seat at each stop, access the deposit box, then return to the waiting vehicle.

The witnessing MCPD officer realized what was happening and called for backup.  As marked vehicles approached the car Defendant was a backseat passenger in, Owona took off at high speed.  Eventually, MCPD vehicles pinned his vehicle between them as it sat on grass alongside the road.  Owona attempted to escape again by ramming the MCPD cars, doing over $10,000 in damage, and as he spun the tires in the wet grass the vehicle slid sideways, striking one officer without injuring him.  Owona and his front-seat passenger declined officers' direction to exit the vehicle and turn its engine off, so one officer broke the driver's window, turned off the vehicle, and extracted the driver by force.  Co-defendant Ibrahim Kourouma also failed to obey

commands to exit the front passenger door, and he was similarly extracted after officers broke his window. The backseat passengers, Defendant and Washington, exited voluntarily.

In the back seat, officers recovered several non-postmarked letters, including several containing checks. Officers also recovered an Arrow Key for the Bethesda/Chevy Chase area from the vehicle's center console.

In a post-arrest interview, Defendant denied knowing the other occupants of the vehicle well, claiming to have just met them earlier that day. There is likely an element of truth to his claim of only recently meeting at least two of his co-defendants, as Owona and Kourouma are residents of Prince George's County and attend college at Bowie State University, while Defendant is a resident of western Baltimore County.

Contents of his cell phone, however, revealed that Defendant knew what he was doing that evening—obtaining checks which he could then alter or counterfeit. Even though investigators were unable to obtain text message or email information from Defendant's iPhone during a warranted search due to encryption features, the limited videos and photos that investigators were able to recover from Defendant's phone showed that Defendant had been dealing in stolen checks for at least the past several months.

Self-taken videos on his phone showed Defendant depositing stolen checks in an ATM, in one case, and counterfeiting another check on a laptop in another. The checks involved in those videos, along with checks shown in other photos located on Defendant's phone, were tied to actual or attempted negotiations totaling over $313,000.

After Defendant's arrest on the instant charges, he was placed on very restrictive conditions of release, and largely abided by those conditions over the following 11 months. Three weeks after entering his plea in this case, however, Defendant was arrested outside of a Pikesville M&T

Bank under the circumstances described in the PSR's ¶ 33. Although that conduct is yet unproved and not admitted by Defendant, the incident involved the alteration of a $50,000 check stolen from the mail and deposited by an aging drug addict who identified Defendant as having furnished her with the requisite documents.

The government has not decided whether to bring new charges against Defendant, whose alleged conduct could implicate Aggravated Identity Theft charges. The government has obtained a search warrant to examine the contents of the phone Defendant was using at the time of his arrest, but, based on its experience with Defendant's earlier phone, is not optimistic of full success. Meanwhile, the Baltimore County State's Attorney's Office is proceeding towards trying Defendant on state charges in November.

Guidelines

Consistent with the plea agreement in this case, the government agrees with the PSR's recommendation of an Offense Level of 20 based on U.S.S.G. § 2B1.1. The government also agrees with the PSR that the contemplated 3-level downward adjustment for prompt acceptance of responsibility should no longer apply.

The government noted during the plea hearing that it anticipated the Court would apply the upcoming amendment to U.S.S.G. § 4C1.1 to reduce Defendant's offense level by two because he had no scoring criminal history points. The government acknowledges that the impending Guideline Amendment to U.S.S.G. § 4C1.1 would still entitle Defendant to a two-level downward departure in offense level based on his having zero criminal history points, since his alleged post-plea conduct does not directly implicate any of the exceptions to application of that new rule.

Recommendation

4

Prior to Defendant's most recent conduct—which, though only alleged at this stage, bears the hallmarks of continued criminal activity in the same vein as his admitted conduct but with the potential aggravation of affirmative identity theft and is not easily amenable to innocent explanation—the government anticipated recommending a low-end guideline sentence based on an offense level of 15 and no criminal history. A low-end sentence in the resulting guideline range was also thought to reflect Defendant's relative youth and credit his commitment to reforming himself positively. The Defendant's post-plea conduct, however, has significantly affected the government's rationale and recommendation, however, as Defendant appears to have had little remorse or inclination to abandon criminal conduct that yielded easy money.

Although the government recommends that the Court sentence the Defendant as if he were in the guideline range provided for by Offense Level 18 and Criminal History Category I, it recommends the Court do so at the high end, where that range intersects with the range provided for by Offense Level 20 at the same Criminal History Category.

A **33-month sentence of imprisonment** is sufficient but not greater than necessary to reflect the nature and circumstances of the offense, to promote respect for the law, to protect the community from further crimes of the Defendant, and to provide specific and general deterrence to others who would make the same choices as has the Defendant over the past two years.

Crimes involving stolen checks and stolen mail generally are rarely punished harshly. Individuals like Defendant understand that insulating themselves by using proxies and recruited accomplices, as well as keeping dollar amounts in the low thousands, combine to significantly reduce the chance that their crimes will be investigated and, even if investigated, linked to them specifically. Faced with the realistic expectation of being able to get away with the vast majority of fraudulent transactions permitted by the checks they steal (or purchase from others who

5

specialize in that part of the scheme), those like Defendant make risk-reward calculations and determine that the chance that the chance of significant punishment is low.

An additional calculation that Defendant likely relied on was the general reticence of Courts to punish young offenders for financial crimes, since most ascribe them to youthful errors of judgment and not a deliberate choice to embark on a criminal path.  Absent the Defendant being caught yet again after his plea, he had every reason to expect that the government and Court would give him the benefit of the doubt.

That benefit should no longer apply here.  Defendant's apparent post-plea conduct signals that his earlier guilty plea marked not an intent to abandon his former course of conduct, but instead only that he accepted as a cost of doing business what minimal sentence he anticipated. Defendant, and others similarly situated, should receive a guideline sentence to change their assumptions and risk-reward calculations.

Protecting the community is another factor the Court should consider in sentencing Defendant at the high end of the soon-to-be-lowered guideline range.  Rampant theft of deposited mail—primarily in search of uncashed checks—is undermining faith in the U.S. postal system. The USPS itself admitted as much this past June when it advised the public not to mail checks unless they were taken inside a post office.[1] And, as many states—like Maryland—don't have specific criminal laws to safeguard the mail, it falls on the relatively rare federal prosecution (rare relative to the 680,000 reported check fraud cases in 2022, at least) to send a signal message by way of an upper-end guideline punishment that such crime is taken seriously.

---

[1] *See, e.g.*, https://www.cbsnews.com/pittsburgh/news/u-s-postal-service-warning-checks-mail/, last accessed September 18, 2023.

As stated in the opening paragraph, the government does not have any restitution claims to present to the Court at this time, or any other financial aspects of the sentence aside from the mandatory special assessment of $100. The government suspects the lack of restitution claims, despite notice to the banks involved in these incidents, is not because the banks have somehow been made whole or sustained no pecuniary losses, but because most are skeptical that the extra work involved in preparing a restitution claim, however minimal, is unlikely to result in any substantial receipt of restitution payments. The government submits that the lack of restitution claims should not be understood to undermine the significance of Defendant's admitted conduct.

The government further recommends that the Court impose the maximum term of supervised release authorized by the statute of conviction—3 years—following the term of imprisonment imposed.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Adam K. Ake
Darren S. Gardner
Assistant United States Attorneys